**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| *In re Ex Parte* Application of FourWorld Event Opportunities Fund, L.P. for an order, pursuant to 28 U.S.C. § 1782, Granting It Leave To Obtain Discovery for Use in Foreign Proceedings. | Case No. 22-mc-00330 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**DECLARATION OF PONTUS SCHERP IN SUPPORT OF**
***EX PARTE* APPLICATION FOR AN ORDER TO OBTAIN DISCOVERY**
**FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**</u>

I, Pontus Scherp, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I am a licensed Swedish attorney and am a founding partner of the disputes specialist law firm Norburg & Scherp Advokatbyrå AB, located in Sweden. With more than two decades of experience, I specialize in international and domestic arbitration and commercial litigation across many industry sectors and practice areas including in appraisal and redemption proceedings, merger and acquisition litigation, and shareholder-related disputes. Since I practice law almost exclusively in Sweden, I am well versed in Swedish law and the rules and practices of Sweden's courts and arbitral forums. I am a Fellow of the Chartered Institute of Arbitrators and regularly serve as an arbitrator in international and domestic arbitration proceedings. After studying American and international law at the University of Minnesota Law School in 1998, I completed my legal education at Uppsala University in Sweden in 2001 and subsequently obtained a CIArb Diploma in International Commercial Arbitration at Oxford. I have been recommended by Chambers and Partners (Chambers Global and Chambers Europe), The Legal 500, Leaders League, Euromoney Legal Media Group, Global Arbitration Review, and Who's Who Legal.

2. My firm and I represent petitioner FourWorld Event Opportunities Fund, L.P. (the "Petitioner") and other plaintiffs in the Swedish court proceeding titled *FourWorld Capital Management, et al. v. HomeStar InvestCo AB*, filed on May 13, 2022 and pending in the Stockholm District Court (the "Legal Proceedings"). As a dissenting stockholder, Petitioner brought the Legal Proceedings in order to determine the proper buy-out price for its compulsorily redeemed shares in Hembla AB ("Hembla"), pursuant to Chapter 22, Section 24 of the Swedish Companies Act (2005) (the "Companies Act").

3. I respectfully submit this declaration in support of the Petitioner's *ex parte* application, pursuant to 28 U.S.C. § 1782 and Rules 26, 30 and 45 of the Federal Rules of Civil Procedure, to obtain discovery from respondent JPMorgan Chase & Co. ("JPM"), including the production of documents and deposition testimony, for use in the Legal Proceedings. I have been informed that JPM's wholly owned subsidiary, J.P. Morgan Securities plc ("JPMS"), served as the financial advisor to Vonovia SE ("Vonovia"), which, in turn, through its wholly owned subsidiary HomeStar InvestCo AB ("HomeStar"), became the majority owner and purchaser of Hembla and squeezed out Hembla's minority shareholders, including Petitioner. I have personal knowledge of the contents of this declaration, except that to the extent they are not within my personal knowledge, then I believe the contents are true and accurate to the best of my knowledge, information and belief.

4. As set forth below, this declaration demonstrates that this discovery application is compatible with Swedish law and meritorious because the discovery sought is not within the jurisdictional reach of the Stockholm District Court; there is no persuasive indication that the Stockholm District Court will be unreceptive to the discovery; Petitioner is not utilizing this application to circumvent any proof-gathering restrictions or policies in Sweden; and Petitioner's

targeted discovery, which relates to the buy-out price of the Hembla shares and associated issues, is tailored to the Legal Proceedings and is not unduly burdensome or intrusive.

**Petitioner Is Entitled to the Discovery from JPM**

I.  **The Parties**

5.  Petitioner is an investment fund managed by FourWorld Capital Management LLC ("FourWorld"), a registered investment adviser. FourWorld, for example, focuses on event-driven investment opportunities such as transactions where a majority shareholder is abusing its power to the detriment of minority shareholders, improperly exercising control over the company, or forcing mandatory redemption without fair compensation to the shareholders.

6.  Hembla is a real estate company that focuses on the ownership and development of rental residential properties in Greater Stockholm. Through January 10, 2020, Hembla was a publicly traded company on the Nasdaq Stockholm, formerly known as the Stockholm Stock Exchange.

7.  Vonovia is a German real estate company and is Europe's largest private real estate company for rental housing. Vonovia currently owns approximately 550,000 homes in Germany, Sweden and Austria. Its holdings are worth around €99 billion.[1] Following Vonovia's acquisition of Hembla and another real estate company, acting through Vonovia's Swedish wholly owned subsidiary HomeStar, Vonovia has become the largest residential company in Sweden.[2] As the parent company, Vonovia ultimately controls HomeStar's management, finances and operations and made the decision to acquire Hembla and established the terms of the acquisition.

---

[1] *See* Vonovia Company Profile, at https://investoren.vonovia.de/en/vonovia-at-a-glance/company-profile/, annexed as Exhibit A.

[2] *See* Vonovia Press Release dated November 5, 2019, annexed as Exhibit B.

8. To my knowledge, JPM, through its wholly owned subsidiary, JPMS, was the financial advisor to Vonovia and HomeStar in connection with their acquisition of Hembla and their squeeze-out of Petitioners and the other minority shareholders. *See* Vonovia's Press Release dated November 7, 2019, at 10, annexed as Exhibit C.

## II. Vonovia's Squeeze-Out of Petitioner

9. Vega Holdco S.á r.l. ("Vega") is a company wholly owned by real estate investment trusts which are advised by the private equity firm The Blackstone Group Inc. ("Blackstone"). Prior to September 23, 2019, Vega was the majority shareholder of Hembla.

10. On September 23, 2019, Vonovia, advised by JPM and its subsidiary, announced in a press release that it had entered into an agreement with Blackstone, through Vonovia's wholly owned subsidiary HomeStar, to acquire Blackstone's entire shareholding in Hembla. *See* Vonovia's Press Release dated September 23, 2019, annexed as Exhibit D. HomeStar's purchase price for the Blackstone/Vega shares was equivalent to SEK 215 per share. Vonovia's acquisition comprised 6,136,989 Class A shares and 50,722,985 Class B shares, representing approximately 69 percent of the voting rights and approximately 61 percent of the share capital of Hembla.

11. After HomeStar completed the acquisition of Blackstone's shares following approval by the Swedish regulatory authorities, Homestar became legally obligated to make an offer to acquire the shares of the other public stockholders of Hembla in accordance with the rules on mandatory bids in Chapter 3, Section 1 of the Swedish Act on Public Takeover Offers on the Stock Market (2006) (*Sw. lag om offentliga uppköpserbjudanden på aktiemarknaden* [2006:451]), which is annexed as Exhibit E.

12. On November 7, 2019, HomeStar, still advised by JPM and JPMS, announced a tender offer to acquire all of the outstanding Class B shares in Hembla (the "Offer"). HomeStar's

proposed price was the same as the consideration paid to Vega, SEK 215 per share. HomeStar stated that the price would not be increased and that the Offer was not subject to any conditions. On November 8, 2019, the Offer document was published, and the initial acceptance period for the Offer began on November 11, 2019 and ended on December 9, 2019. *See* Offer, annexed as Exhibit F. On December 10, 2019, HomeStar announced that it would hold 94 percent of Hembla's stock but, at the same time, extended the Offer until January 8, 2020. *See* Vonovia's Press Release dated December 10, 2019, annexed as Exhibit G.

13.   In connection with the Offer, Hembla's Board of Directors formed an independent bid committee (the "Independent Committee"). The Independent Committee engaged Handelsbanken Capital Markets ("Handelsbanken"), a boutique investment banking firm and subsidiary of Svenska Handelsbanken AB, to provide a fairness opinion in accordance with the Nasdaq Stockholm takeover rules (the "Takeover Rules").

14.   On November 21, 2019, Handelsbanken issued its fairness opinion and concluded that the Offer was not fair to the Hembla shareholders (the "Fairness Opinion"). In the Fairness Opinion, Handelsbanken stated that, among other things, it "discussed the Hembla operations, financial position, profit development, strategy and future prospects with senior members of management of Hembla," "considered certain financial and stock exchange related information regarding Hembla in comparison with similar information regarding certain other companies with similar operations as well as comparable acquisition transactions," "[took] into consideration the share price development and trading activity in the Hembla share," and "performed such other analysis and studies which we have considered appropriate as a basis for this opinion." Handelsbanken made clear that "[o]ur opinion is based on the Swedish regulatory system and upon current market, economic, financial and other conditions as well as information made available to

us," and determined that "the offer as of the date hereof, from a financial point of view, is **not fair** to the Hembla shareholders." *See* Fairness Opinion, located in the Supplement to HomeStar Invest Co AB's offer document regarding the offer to the shareholders in Hembla AB (the "Supplement"), at 7-8, annexed as Exhibit H (emphasis added).

15. The same day, on November 21, 2019, consistent with the Takeover Rules, the Independent Committee reviewed "Hembla's current position and expected future development based on the Company's growth model and possibilities and risks related thereto" and other information, and issued its own opinion regarding the Offer's anticipated impact on Hembla. The Independent Committee concluded that "[f]ollowing an overall assessment, the Committee is of the opinion that the Offer does not fully reflect Hembla's growth potential and value from a financial perspective. In light of the above, and on the basis of the current state of the market and interest rate level, the Committee therefore unanimously recommends Hembla's shareholders to ***not accept*** the Offer." *See* Ex. H at 5 (emphasis added).

16. Notwithstanding the opinions by Handelsbanken and the Independent Committee, Vonovia, on December 18, 2019, announced that HomeStar had requested the compulsory redemption of the minority shares in Hembla and that Hembla had applied for delisting from the stock exchange. *See* Vonovia's Press Release dated December 18, 2019, annexed as Exhibit I. While the Offer had not yet expired, HomeStar, which already had majority ownership in Hembla, announced that it nevertheless had reached holdings in excess of 90 percent at this time.

17. Hembla announced in a press release on December 19, 2019, that Nasdaq Stockholm on the same day had approved Hembla's application for delisting and determined that the last trading day for Hembla's stock would be January 10, 2020. *See* Hembla's Press Release dated December 19, 2019, annexed as Exhibit J.

### III.    The Companies Act and the Procedural History

18.    Under the Companies Act (*Sw. aktiebolagslag* [2005:551]), "[a] shareholder who holds more than nine-tenths of the shares in a company (the majority shareholder) shall be entitled to buy-out the remaining shares of the other shareholders of the company. Any person whose shares may be bought out shall be entitled to compel the majority shareholder to purchase his shares." *See* Companies Act, Ch. 22, at § 1, annexed as Exhibit K.

19.    In the event of a dispute regarding the purchase price for the shares being bought out, "[t]he purchase price for a share shall be determined in such a manner that it corresponds to the price for the share which might be expected upon a sale under normal circumstances" (the "Main Rule") and "[w]ith respect to a share which is traded on a Swedish or foreign exchange, an authorised marketplace or any other regulated market, the purchase price shall correspond to the listed value, unless special grounds otherwise dictate" (the "Listed Price Rule"). *Id.* at § 2. "The purchase price shall be determined taking into consideration the circumstances pertaining at the time a request for arbitration was made. . . . Where reasons exist therefor, the amount may instead be determined taking into consideration the circumstances prevailing at an earlier time." *Id.*[3]

20.    The Companies Act provides that a dispute concerning the amount of the purchase price shall be determined by arbitration, except that "[a] party or trustee who is dissatisfied with an arbitral award in a buy-out dispute shall be entitled to commence proceedings before the

---

[3] According to Swedish Professor Daniel Stattin, "Overall, the background of the listed price rule demonstrates that the rule is an appropriate method for determining the redemption price, provided that the market is functioning and is efficient as briefly described above. However, the connection between the listed price rule and the market efficiency hypothesis also demonstrates that situations exist where it does not lead to a correct redemption price, due to the market not being efficient in the sense that it does not reflect the fundamental value of the share. This has been observed by the legislat[ure] and is reflected in the phrase 'unless special grounds otherwise dictate.'" *See* Legal Opinion dated June 27, 2021, by Professor Stattin, at 6, an excerpt of which is annexed as Exhibit L.

Page 7 of **18**

Stockholm District Court. . . ." Ex. K at §§ 2, 24. An arbitral award in redemption proceedings may thus be appealed. The Stockholm District Court is empowered to review the arbitral award *de novo* and is not bound by any previous findings of the arbitral tribunal. The parties may also invoke new legal and factual grounds and adduce new evidence before the Stockholm District Court. The Swedish legislators cautioned that "it is vital for the arbitration panel or court responsible for assessing a buy-out issue in the specific case, to carefully consider whether circumstances exist whereby the listed price is not an appropriate yardstick for the value of the share." *See* Government Bill, Prop. 2004/05:85 at 451, annexed as Exhibit M.

21. HomeStar commenced arbitration in accordance with the Companies Act. In an arbitration award dated June 11, 2020, the arbitral tribunal determined that Homestar had the right and obligation to redeem the Hembla shares not already owned by HomeStar, and ordered that HomeStar have prior access to those shares even though the decision had not yet become final. By separate arbitration award dated March 15, 2022, the arbitral tribunal ruled that since the Hembla share was traded on a regulated market and no special reasons justifying a deviation existed, the Listed Price Rule should be applied, which in effect will result in minority shareholders, including Petitioner, being paid only SEK 215 per share in connection with HomeStar's squeeze-out.

22. Following the arbitration, consistent with the Companies Act, Petitioner timely and properly challenged the separate arbitration award in the Stockholm District Court, in the Legal Proceedings, requesting that the Court declare that the Listed Price Rule shall not be applied when determining the redemption price of the Hembla stock holdings and, thus, asking that the arbitration award be overturned. The Legal Proceedings were commenced by Petitioner against HomeStar on May 13, 2022, and they are ongoing.

### IV. HomeStar's Unfair Buy-Out Price of the Hembla Shares, and Petitioner's Claims in the Legal Proceedings

23. The determinative issue in the Legal Proceedings, in accordance with the Listed Price Rule, is whether there are special grounds for not applying Hembla's listed stock price in ascertaining the value and buy-out price of Petitioner's mandatorily redeemed shares. This issue is fundamental; Petitioner states in the Legal Proceedings that the stock exchange price is a poor indicator of the market value of shares in a takeover situation since the public takeover bid influences or even controls the stock exchange price, with the exchange price no longer correlating with normal changes at the company or in the market.

24. Petitioner asserts that on the last day of trading, December 18, 2019 (the "Call Date"), Hembla's stock price did not correspond to the price of Hembla's shares that could be charged in a sale under normal circumstances and certainly did not correlate with the true, fundamental value of the shares. It is being put forward by Petitioner that the stock price was completely unrelated to the significantly higher fair value of the Hembla shares, for the reasons summarized below.

25. First, the stock price for Hembla shares expressed a price that was determined only by and between two parties, HomeStar and Blackstone, in a single transaction. On September 23, 2019, HomeStar acquired 69.3 percent of the shares (votes) in Hembla at that price through a block purchase, which in turn triggered a bid obligation for all remaining shares in Hembla. From that date, the market knew that HomeStar would subsequently acquire all of the remaining Hembla shares for SEK 215 through an unconditional public tender offer, seeking to compulsorily redeem the shares for the same exact price paid to Blackstone. Since the Blackstone sale, and because of that transaction, the Hembla shares had been priced on the stock exchange, and in connection with the Offer, based on the SEK 215 price per share paid by HomeStar to Blackstone. The listed share

price remained at that price during the acceptance period and through the Call Date, with only minor fluctuations, until Hembla was delisted.

26. The chart below reflects that after HomeStar's acquisition of Blackstone's shares was announced on September 23, 2019, the stock price of Hembla's shares was adjusted to a level corresponding to the SEK 215 per share purchase price paid to Blackstone, and that the quoted value of Hembla's shares thereafter remained at the same level with only minor fluctuations until the Call Date:



Clearly, even as of the Call Date, the Hembla stock price related only to the purchase price of Blackstone's shares and not to the stock market in general, the industry or Hembla's performance or other company-specific factors. *See also* Expert Report dated June 20, 2021, by Professor Björn Hagströmer (the "Hagströmer Report"), at ¶ 3.2.10, an excerpt of which is annexed as Exhibit N

(observing pointedly that "I am not aware of any research maintaining that the stock market price of a share that is subject to a takeover represents the fundamental value that would apply if there were no such offer.").[4]

27. Second, the trading prices of Swedish real estate companies and the country's real estate indices significantly increased following the Blackstone transaction and the Call Date, and much more so than the low "premium" paid to Hembla shareholders. According to Professor Hagströmer, "statistical analysis, performed using widely accepted tools, shows that, following the announcement of the public takeover bid, the share price for Hembla B is more or less disconnected from market factors linked to the share's fundamental value. The correlations in price movements between Hembla B and various Swedish real estate indices, which were clear prior to the public takeover bid, drops to nearly zero. Instead, the share price for Hembla B is fluctuating around the level of the takeover bid." *See* Hagströmer Report, at ¶ 2.1.1 (Ex. N). While real estate values climbed in Sweden, Hembla's stock price remained parked around the SEK 215 bid price during this time period.

28. Third, the price of SEK 215 did not correspond to the real value of the Hembla share even at the time of the Blackstone transaction. The Blackstone deal concerned a large

---

[4] In considering the Listed Price Rule, the Swedish legislature stated that "[i]n our view, the listed price may also be an inappropriate yardstick in situations other than those that the Committee had in mind. It may be the case that the listed price has fallen as a result of the actions of the majority shareholder, without there having been any improper conduct or deception. This may be the case, for example, where the listed price is a direct consequence of the amount that the majority shareholder has offered for the shares in the event of a public takeover bid that has preceded the redemption procedure. If such an offer has not been accepted by a sufficient number of shareholders for the special rule to apply . . . it may give rise to concerns about using the listed price as the basis for determining the purchase price. Such an arrangement could, in practice, lead to the special rule being given a broader scope than is desirable, and to a tenderer in the case of a public takeover bid, electing to position their bid at a lower level than they would otherwise have done. An overly categorical connection to the listed price may, in certain cases, also lead to a kind of circular effect, where the listed price reflects the market's expectations of the purchase price that the arbitration panel or the court - on the basis of the share's listed price - will determine." *See* Ex. M at 451.

majority stake. Since it is difficult to sell such a large stake on the stock exchange without affecting the listed price, such a transaction requires a discounted sale price. It is therefore natural that Blackstone sought a buyer for the entire stake for an off-market sale. This economic reality demonstrates that the price of SEK 215 per Hembla share, in connection with the Blackstone transaction, likely is discounted in relation to the fair market value of the share.

29.     Fourth, there was no formal sale or auction process leading up to the sale of Blackstone's Hembla shares, which is customary in the financial market and is used by a strategic seller or the board of the target company in order to obtain the best possible sale price. In fact, HomeStar's acquisition of a block of shares from Blackstone made it impossible for another potential buyer to make a competing bid, which could have 'market tested' the bilateral price set by HomeStar and Blackstone.

30.     Fifth, there were no opportunities to raise the bid. HomeStar already indicated when the bid was announced that the price would not be raised, despite shareholders' public criticism of the bid price. HomeStar made it clear that the Offer was unconditional, that the bid price was not negotiable, and that the purchase of Hembla's remaining shares would be carried out strictly in accordance with the terms of the Offer.

31.     Sixth, HomeStar's bid price was not considered fair to Hembla shareholders according to Handelsbanken, the independent valuation firm, as detailed in its Fairness Opinion and following its comprehensive assessment. *See* Ex. H at 7-8.

32.     Seventh, Hembla's Independent Committee, comprised of directors without conflicts of interest, concluded that the offer price did not reflect Hembla's growth potential and value from a financial perspective and unanimously recommended that Hembla's shareholders not accept the Offer. *Id.* at 4. The Independent Committee (and Handelsbanken), with access to all

information relevant to the assessment of the price of the shares, including non-public information, had a far better insight into the business of Hembla than the general public and outside investors had at the time. The opinion of the Independent Committee (and Handelsbanken) that the bid did not constitute a fair price for Hembla's shares shows that the market price did not reflect the true value of the Hembla shares.

33. Eighth, the bid premium in connection with the Offer was very low compared to previous public takeover bids in Sweden, as asserted by Petitioner.

34. Finally, the Offer and its price were so unattractive to Hembla's minority shareholders that it resulted in a very low participation rate from minority shareholders. Although the median acceptance rate among all public takeover bids after a block purchase by each of the bidders, between 2009 and 2019, was significantly above 90 percent, only approximately 78 percent of the shares subject to the Offer were accepted by the minority shareholders of Hembla.

35. For the reasons enumerated above, among others, Petitioner expects that, following discovery, the Stockholm District Court will rule that the redemption amount for Hembla's shares shall not be determined by applying the price for the Hembla share on the Nasdaq Stockholm and on the relevant date, *i.e.*, the price shall not be determined by applying the Listed Price Rule, but that it should instead, pursuant to the Main Rule, be established after valuation of the expected price in a sale under normal circumstances, in accordance with the Companies Act.

V. **The Targeted 1782 Discovery Sought from JPM**

36. Petitioner seeks important discovery from JPM, including documents and testimony, narrowly tailored to the subject matter of the Legal Proceedings. *See* Proposed Subpoenas attached as Exhibits 1 and 2 to the accompanying Transmittal Declaration of Marc R. Rosen (the "Rosen Decl.").

37.  By way of example, the discovery sought by Petitioner principally concerns the valuation and buy-out price of Hembla shares, including the Blackstone transaction which set the stock price for Hembla shares, the determination of the Offer price and the other terms imposed on Hembla's minority shareholders by Vonovia, Homestar's conflict of interest as majority shareholder and purchaser of Hembla, the effect on Hembla's stock price by virtue of the Blackstone transaction, the informational asymmetry between Vonovia and HomeStar and their directors and advisors, on the one hand, and public investors, on the other hand, JPM's work as financial advisor to HomeStar and Vonovia, discussions of any alternative plans for Hembla at the time of the acquisition, JPM's knowledge of the evaluations of the Offer by the Independent Committee and Handelsbanken, JPM's communications concerning the Offer and HomeStar's acquisition, and the true, fundamental value of Hembla and its shares.

38.  This discovery relates directly to the appraisal of Hembla's stock and whether there are special grounds for not applying Hembla's listed stock price in ascertaining the buy-out price of Petitioner's compulsorily redeemed shares, all at issue in the Legal Proceedings. At every opportunity, HomeStar so far has resisted the production of this discovery in Sweden, especially discovery concerning the real value of Hembla's shares, and HomeStar has continued to do so in the Legal Proceedings. But JPM will have collected or have unfettered access to copies of all the discovery sought by Petitioner for use in the Legal Proceedings.

39.  Petitioner's targeted discovery requests are necessary for the prosecution of their claims at issue in the Legal Proceedings and are in my view not unduly burdensome or intrusive.

40.  This discovery application, pursuant to 28 U.S.C. § 1782, is made in good faith and is not intended to, and does not, circumvent any Swedish proof-gathering restrictions or policies.

### VI. The Limited Jurisdictional Reach of the Legal Proceedings

41. JPM and JPMS, are not parties to the Legal Proceedings. Given that a decision by a Swedish court compelling JPM or JPMS to produce documents, as I understand it, would not be enforceable in the United States, the companies are not within the jurisdictional reach of the Stockholm District Court.

42. JPM's principal place of business is located not in Sweden but, to my knowledge, at 383 Madison Avenue, New York, New York 10179. *See* J.P. Morgan Chase & Co. Form 10-K dated February 22, 2022, for the fiscal year ended 2021 and filed with the U.S. Securities and Exchange Commission, at cover page and 34, annexed to the Rosen Decl. as Exhibit 3. JPMS, similarly, is located at 25 Bank Street in London and is not located in Sweden.[5] Given its inability to render decisions on the production of documents that would be enforceable in the United States, the Stockholm District Court is powerless to compel JPM and its subsidiary to produce documents in the Legal Proceedings.

43. Swedish law should allow Swedish courts to consider deposition testimony obtained pursuant to 28 U.S.C. § 1782.

44. Absent assistance from this Court under 28 U.S.C. § 1782, there is a significant risk that Petitioner will not have a pathway to obtain in the Legal Proceedings any documentary or testimonial discovery from JPM, HomeStar's financial advisor, in a timely manner or otherwise.

---

[5] *See* JPM/JPMS Announcement dated July 6, 2012, at https://www.jpmorgan.com/disclosures/uk_entities_jul2012, annexed to the Rosen Decl. as Ex. 5.

VII. **The Stockholm District Court Would Be Receptive to the Discovery Obtained Pursuant to 28 U.S.C. § 1782**

45. Based on my professional experience as a Swedish lawyer and my understanding of court rules and practices in Sweden, the Stockholm District Court will be receptive to the evidence sought in this application under 28 U.S.C. § 1782.

46. The Stockholm District Court expects the parties to obtain evidence necessary to pursue their claims, and evaluation of the evidence remains at the court's discretion. In Sweden, there are no judicial, executive or legislative declarations or directives that prohibit the use of evidence gathered pursuant to a foreign country's laws or discovery procedures, such as 28 U.S.C. § 1782.

47. There is no requirement that parties obtain permission from the Stockholm District Court before seeking non-party evidence abroad, including through a proceeding brought under 28 U.S.C. § 1782.

48. Under Swedish procedural law, the freedom to adduce evidence (*Sw. fri bevisföring*) and the freedom to evaluate evidence (*Sw. fri bevisvärdering*) are two central principles. These principles are expressed in Chapter 35, Section 1 of the Swedish Procedural Code (Sw. rättegångsbalken): "After evaluating everything that has occurred in accordance with the dictates of its conscience, the court shall determine what has been proved in the case." *See* Exhibit O.

49. The principle of freedom to adduce evidence means that the parties are free to submit and rely on any piece of evidence they see fit. For example, even illegitimately obtained pieces of evidence may be submitted and relied upon by the parties. An exception to the principle of freedom to adduce evidence is that the Swedish court, pursuant to Chapter 35, Section 7 of the Swedish Procedural Code, may exclude evidence if it determines that the evidence is clearly

irrelevant or unnecessary or where the taking of the evidence would be disproportionally costly or burdensome. *Id.*

50. The principle of freedom to evaluate evidence means that the judges' evaluation of the evidence presented by the parties is also free. The judges are thus not bound by any legal rules when assessing the value of the evidence.

51. In the legal anthology "Swedish Legal System," annexed as Exhibit P, the procedural rules on evidence in civil procedures are explained as follows: "The above-mentioned principle of adversarial proceedings also encompasses the right to adduce evidence in support of one's case. The main rule is that the parties are free to adduce any evidentiary means (*bevismedel*) that, in their opinion, best support their case before the court, the principle of freedom to adduce evidence (*fri bevisföring*). This principle is supplemented by the principle of freedom to present one's case (*fri processföring*), which means that a party is entirely free to choose how to make its case before the court; what claims to make; what factual grounds to plead in support of them etc. . . . There are no rules of evidence in Swedish law that specify what types of evidence are admissible or inadmissible. Instead, parties choose what evidence to adduce in support of their case. Under the principle of freedom to adduce evidence, there are essentially no restrictions to the evidentiary means that may be relied upon. Similarly, judges' evaluation of evidence is also free and not bound by any legal rules, the principle of freedom to evaluate evidence (*fri bevisvärdering*) (Ch. 35 Sec. 1 RB)." *See* Ex. P.

52. The Swedish rules on evidence thus allow parties to freely submit evidence obtained through any means, including evidence obtained through a Section 1782 application. Evidence obtained through such a procedure is admissible in a Swedish court. The value of the evidence will be assessed freely by the Swedish judge, as will any submitted evidence. In light of

the foregoing and in accordance with Swedish law and practice, the Stockholm District Court is not bound by the prior arbitration award or any substantive, procedural or discovery-related findings or rulings made in the arbitral proceeding; the Swedish court will make its own findings of fact and law based on the evidence to be freely submitted by the parties in the now-pending Legal Proceedings.

53. The Stockholm District Court has not determined that any evidence submitted or to be submitted in the Legal Proceedings should be excluded for any reason.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 16, 2022.

_____
Pontus Scherp